UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LAVONDA JEAN
BECKROW,

                Plaintiff

v.

ANDREW SAUL,
COMMISSIONER OF
SOCIAL SECURITY,

          Defendant.

_____/

Civil Action No.: 19-12834
Honorable Stephen J. Murphy III
Magistrate Judge Elizabeth A. Stafford

**REPORT AND RECOMMENDATION ON CROSS-
MOTIONS FOR SUMMARY JUDGMENT [ECF. NOS. 14, 15]**

Plaintiff LaVonda Jean Beckrow appeals a final decision of defendant

Commissioner of Social Security (Commissioner) application for disability

insurance benefits (DIB) and supplemental security income (SSI) under the

Social Security Act.  Both parties have filed summary judgment motions,

referred to this Court for a report and recommendation under 28 U.S.C.

§ 636(b)(1)(B).  After review of the record, the Court finds that the

administrative law judge's (ALJ) decision is not supported by substantial

evidence, and thus **RECOMMENDS** that:

- Beckrow's motion [ECF No. 14] be **GRANTED**;

- the Commissioner's motion [ECF No. 15] be **DENIED**; and

- the matter be **REMANDED** under sentence four of 42 U.S.C. § 405(g) for further consideration consistent with this report and recommendation.

## I.   BACKGROUND

### A.   Background and Disability Applications

Born in March 1970, Beckrow was 46 years old when she applied for benefits in 2016.  [ECF No. 9-5, PageID.250, 265].  Her alleged onset date for disability was in July 2016, and her date last insured for DIB purposes is December 31, 2021.  [ECF No. 9-2, PageID.48].  Beckrow had past relevant work as a nurse assistant.  [*Id.*, PageID.66, 97].  She claimed to be disabled from fibromyalgia, degenerative disc disease, carpal tunnel, osteoarthritis in back, depression, anxiety disorder, scoliosis, and bipolar disorder.  [ECF No. 9-6, PageID.282].

After the Commissioner denied her disability application initially, Beckrow requested a hearing, which took place in August 2018, and during which she and a vocational expert (VE) testified.  [ECF No. 9-2, PageID.74-102].  In an August 2018 written decision, the ALJ found Beckrow not disabled.  [*Id.*, PageID.48-68].  The Appeals Council denied review, making

the ALJ's decision the final decision of the Commissioner, and Beckrow

timely filed for judicial review.  [*Id.*, PageID.34-36; ECF No. 1].

### B.    The ALJ's Application of the Disability Framework Analysis

A "disability" is the "inability to engage in any substantial gainful

activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has lasted or

can be expected to last for a continuous period of not less than 12 months."

42 U.S.C. §§ 423(d)(1)(A); 1382c(a)(3)(A).

The Commissioner determines whether an applicant is disabled by

analyzing five sequential steps.  First, if the applicant is "doing substantial

gainful activity," he or she will be found not disabled.  20 C.F.R.

§§ 404.1520(a)(4); 416.920(a)(4).  Second, if the claimant has not had a

severe impairment or a combination of such impairments for a continuous

period of at least 12 months, no disability will be found.[1]  *Id*.  Third, if the

claimant's severe impairments meet or equal the criteria of an impairment

set forth in the Commissioner's Listing of Impairments, the claimant will be

found disabled.  *Id*.  If the fourth step is reached, the Commissioner

considers its assessment of the claimant's residual functional capacity

---

[1] A severe impairment is one that "significantly limits [the claimant's]
physical or mental ability to do basic work activities."  §§ 1520(c); 920(c).

(RFC), and will find the claimant not disabled if he or she can still do past relevant work.  *Id*.  At the final step, the Commissioner reviews the claimant's RFC, age, education, and work experiences, and determines whether the claimant could adjust to other work.  *Id*.  The claimant bears the burden of proof throughout the first four steps, but the burden shifts to the Commissioner if the fifth step is reached.  *Preslar v. Sec'y of Health & Human Servs*., 14 F.3d 1107, 1110 (6th Cir. 1994).

Applying this framework, the ALJ concluded that Beckrow was not disabled.  At the first step, she found that Beckrow had not engaged in substantial gainful activity since her alleged onset date in July 2016.  [ECF No. 9-2, PageID.50].  At the second step, the ALJ found that Beckrow had the severe impairments of "degenerative disc disease, degenerative joint disease, fibromyalgia, headache/migraines, chronic obstructive pulmonary disease, history of cerebral vascular accident, obesity, bipolar I disorder, adjustment disorder with anxiety, and depression."  [*Id.*, PageID.50-51].  The ALJ found non-severe Beckrow's impairments from sleep apnea and carpal tunnel syndrome.  [*Id.*, PageID.51-52].  Next, the ALJ concluded that none of her impairments, either alone or in combination, met or medically equaled the severity of a listed impairment.  [*Id.*, PageID.52].

Between the third and fourth steps, the ALJ found that Beckrow had

4

the RFC

> to perform light work as defined in 20 CFR 404.1567(b) and
> 416.967(b) except [she] cannot climb ladders, ropes, or
> scaffolds; she can occasionally climb ramps and stairs; she can
> occasionally balance, stoop, kneel, crouch, and crawl; she can
> have only occasional exposure to heat and extreme cold; she
> can have no exposure to vibration, such as vibratory tools or
> machinery; she is limited to work in environments where the
> noise intensity level does not exceed 'moderate' as that term is
> defined in the Selected Characteristics of Occupations; she can
> have only occasional exposure to pulmonary irritants in the
> work setting, such as dust, odors, fumes, gases, and poor
> ventilation; she can have no exposure to hazards, such as
> unprotected heights or dangerous, moving machinery; she is
> limited to simple and routine tasks performed in a work
> environment free of fast-paced production requirements (i.e. no
> work on an assembly line); she is limited to low stress work,
> which is defined as involving only simple, work-related
> decisions and routine workplace changes; she is limited to no
> transactional interaction with the public, i.e. sales, negotiation,
> customer service, or resolution of disputes; the work itself
> should largely deal with things rather than people throughout a
> typical workday; and there should be no tandem tasks or
> teamwork required.

[*Id*., PageID.55].  At step four, the ALJ found that Beckrow could not

perform her past relevant work as a nurse assistant.  [*Id*., PageID.66].  At

the final step, after considering her age, education, work experience, RFC,

and the testimony of the VE, the ALJ determined that there were jobs that

existed in significant numbers that Beckrow could perform, including

positions as a sorter, bagger, bench assembler, sorter/inspector, final

bench assembler, and packager.  [*Id*., PageID.67-68].  The ALJ thus

concluded Beckrow was not disabled.  [*Id*., PageID.68].

## II.   ANALYSIS

### A.

Under § 405(g), this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made in conformity with proper legal standards.  *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 722 (6th Cir. 2014).  Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks and citation omitted).  Only the evidence in the record below may be considered when determining whether the ALJ's decision is supported by substantial evidence.  *Bass v. McMahon*, 499 F.3d 506, 512-513 (6th Cir. 2007).

Beckrow argues that the ALJ committed reversible error by improperly weighing the opinion or her treating physician and evaluating her fibromyalgia.  The Court agrees with Beckrow and recommends that this matter be remanded for further consideration.

6

**B.**

Before addressing Beckrow's arguments, the Court will discuss the legal standards and precedent about claims involving fibromyalgia.

Generally, ALJs are required to evaluate subjective symptoms, including complaints of pain, by confirming that objective medical evidence of the alleged condition exists and determining whether that condition could reasonably be expected to produce the alleged pain or whether other objective evidence verifies the severity of the pain. *See* 20 C.F.R. § 404.1529; Social Security Ruling (SSR) 16-3p, 2017 WL 5180304. The ALJ then assesses any work-related limitations by determining the intensity, persistence and limiting effects of these symptoms. *Id.*

The nature of fibromyalgia complicates this analysis. *Cooper v. Comm'r of Soc. Sec.*, 13-cv-11883, 2014 WL 4606010, at *16 (E.D.Mich., June 17, 2014). In fibromyalgia cases, objective evidence is often unavailing, and overemphasis on it is inappropriate. *Id.*; *Shahin v. Saul*, 18-cv-12939, 2020 WL 38931, at *3 (E.D. Mich., Jan. 3, 2020). Courts in this circuit have routinely remanded matters "because of the ALJ's undue emphasis on the lack of objective evidence." *Cooper*, 2014 WL 4606010, at *16 (collecting cases). Normal findings are not necessarily inconsistent with fibromyalgia, so considerations of normal gait, normal motor strength,

7

non-tender extremities, normal sensation, and normal musculoskeletal range of motion are "simply beyond the point." *Madinger v. Comm'r of Soc. Sec.*, No. 2:16-CV-882, 2019 WL 5091958, at *6 (S.D. Ohio Oct. 11, 2019) (citation and quotation marks omitted).

Thus, when "objective medical evidence does not substantiate the person's statements about the intensity, persistence, and functionally limiting effects of symptoms" of the claimant's fibromyalgia, an ALJ must consider "all of the evidence in the case record, including the person's daily activities, medications or other treatments the person uses, or has used, to alleviate symptoms; the nature and frequency of the person's attempts to obtain medical treatment for symptoms; and statements by other people about the person's symptoms." SSR 12-2p, 2012 WL 3104869 (July 25, 2012); *see also Luukkonen v. Comm'r of Soc. Sec.*, 653 F. App'x 393, 399 (6th Cir. 2016). And because the lack of objective evidence is of decreased relevance in a claim involving fibromyalgia, the opinions of treating medical providers are more critical to the evaluation of whether the claimant is disabled. *Cooper*, 2014 WL 4606010, at *18 ("The diminished potency of traditional evidence has heightened the importance of treating sources in fibromyalgia cases.").

In fact, under rules that apply to all Social Security disability cases for application filed before March 27, 2017,[2] like this one, the opinions of treating physicians are given the most weight and the opinions of non-examining sources are accorded the least weight. *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 375 (6th Cir. 2013) (citing 20 C.F.R. §§ 404.1502, 404.1527(c)). If the ALJ finds that a treating physician's opinion is not entitled to controlling weight, she must give good reasons for the weight accorded to the opinion. *Id.* at 376. The reasons provided must be supported by the evidence in the case record and must be specific enough to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight. *Id.*

In *Rogers*, a seminal opinion about consideration of disability claims involving fibromyalgia, the court found that the ALJ erred by relying on the opinion of the state agency expert instead of the plaintiff's treating physicians. 486 F.3d at 244-46. The *Rogers* court found it significant that

---

[2] For applicants who filed after March 27, 2017, their treating physicians' opinions are not accorded controlling weight. *See* 20 C.F.R. § 404.1520c. But treating physicians' opinions about a claimant with fibromyalgia should continue to carry special weight even under the new rules given the lack of relevance of objective evidence. When a claimant alleges disability because of fibromyalgia, courts should remain critical of ALJ decisions that rely more on the record-review opinions of state agency experts than on opinions from treating physicians, especially rheumatologists.

the treating physicians' records reflected continuous and frequent treatment for intense pain and stiffness; that the treating physicians arrived at the same diagnosis of fibromyalgia; and that one of the treating physicians was a rheumatologist, unlike the state agency record reviewer.  *Id.* at 244-45.

The court emphasized that treating physicians' opinions were "of special significance given the unique nature of fibromyalgia," and criticized the ALJ for relying on the opinions of doctors who had not examined the plaintiff.  *Rogers*, 486 F.3d at 245.  The court also noted that "the foundation for the opinions offered" by those non-examining physicians "was the lack of objective findings."  *Id.*  "[I]n light of the unique evidentiary difficulties associated with the diagnosis and treatment of fibromyalgia, opinions that focus solely upon objective evidence are not particularly relevant."  *Id.*

The ALJ in *Rogers* had also wrongly relied on the lack of corroborating objective evidence to find the claimant's subjective complaints not fully credible.  *Id.* at 246-48.  Worse yet, the ALJ's falsely described the claimant as being "fairly active," and even the ALJ's mischaracterized version of the claimant's activities were "not comparable to typical work activities."  *Id*. at 248.

10

## C.

Like the ALJ in *Rogers*, the ALJ here erred in assessing Beckrow's fibromyalgia, her subjective complaints, and her treating physician's opinions.  Relying on irrelevant objective evidence, the ALJ afforded little weight to the opinions of Arup Sarkar, M.D., Beckrow's primary care provider.  [ECF No. 9-2, PageID.63-64].

Dr. Sarkar treated Beckrow for at least three years; the record includes his reports from 2015 to a month before the August 2018 hearing. [ECF No. 9-10, PageID.495-535; ECF No. 9-14, PageID.800-861; ECF No. 9-19, PageID.1088-1092; ECF No. 9-22, PageID.1279-1352].  In a November 2015 certification under the Family and Medical Leave Act, Dr. Sarkar wrote that "during episodes of flare-ups [Beckrow] will be unable to twist, bend, stoop or sit/stand for long periods."  [ECF No. 9-14, PageID.828-831].  He stated that she would "have times she is unable to function in her daily job duties."  [*Id*.].

Dr. Sarkar examined Beckrow in August 2016 and described her as currently experiencing symptoms of "fatigue, diffuse pain, diffuse tenderness, regional pain, morning stiffness, headache, cognitive impairment and difficulty falling asleep."  [ECF No. 9-10, PageID.506].  He also noted exercise intolerance, dizziness, numbness, tingling, limb

11

weakness, and difficulty walking.  [*Id*.].  Dr. Sarkar said that the

musculoskeletal examination, which involved "inspection/palpation of joints,

bones, and muscles," was abnormal, and that Beckrow had "cervical

radiculopathy worse on the left."  [*Id*., PageID.509].  Dr. Sarkar noted a

diagnosis of fibromyalgia, and that she was prescribed a host of

medications, including Butalbital, Duloxetine HCI, Etodolac, Lyrica,

Ropinirole HCI, and a 50 mcg per hour fentanyl patch to be applied every

72 hours.  [*Id.*, PageID.509-510].

    The next month, in September 2016, Dr. Sarkar issued a physical

assessment based on Beckrow's diagnoses of degenerative disc disease,

"cervical,"[3] fibromyalgia, anxiety, depression, and bipolar disease.  [ECF

No. 9-17, PageID.1006].  He said that her medications caused her

drowsiness, dizziness, and mania.  [*Id*.].  Dr. Sarkar wrote that Beckrow

would need to recline or lie down and take unscheduled breaks during the

workday, and could walk one city block without rest or significant pain.

[*Id*.].  She could sit, stand, and walk for two hours in a workday.  [*Id*.].  Dr.

Sarkar found that Beckrow could lift less than 10 pounds frequently, could

lift 10 pounds occasionally, and could never lift more than that.  [*Id*.].  And

---

[3] Based on Dr. Sarkar's earlier report, the Court believes that he meant to
refer to cervical radiculopathy.  [*See* ECF No. 9-10, PageID.509].

Beckrow could use her hands and arms about 30% of a workday, and use her fingers for fine manipulation during 80% of a workday.  [*Id*.].  Dr. Sarkar estimated that Beckrow would miss work more than four times a month. [*Id*., PageID.1007].

The ALJ gave all of Dr. Sarkar's opinions little weight.  [ECF No. 9-2, PageID.62-64].  But in her motion for summary judgment, Beckrow focuses on the September 2016 physical assessment.  [ECF No. 14, PageID.1483-1487].[4]  The ALJ's discussion about why he gave little weight to that physical assessment is somewhat confusing because he treated as one document the physician assessment and a separate mental assessment issued by Dr. Sarkar on the same day.  [ECF No. 9-2, PageID.62-63; ECF No. 9-17, PageID.1003-1005].  For example, the ALJ described limitations that Dr. Sarkar included on his physical assessment, but then cited the mental assessment to support this statement: "However, when asked on the form to describe the medical/clinical findings that support his assessment, Dr. Sarkar left this part blank."  [ECF No. 9-2, PageID.63, citing exhibit 11F/3-4, which is at ECF No. 9-17, PageID.1003-1004].

---

[4] Beckrow's brief cites the copy of this report at ECF No. 9-10, PageID.539-540.

In giving little weight to Dr. Sarkar's September 2016 physical assessment, the ALJ also said that the restrictions cited were "more restrictive than is supported by the medical evidence of record and [Beckrow's] activities of daily living." [ECF No. 9-2, PageID.63]. In support, the ALJ cited a July 2016 electromyography (EMG) that was normal in all extremities; a neurosurgeon's opinion that she was not a candidate for surgery; a report that her gait was even; her normal extension, flexion, and strength in her hips and knees; and the daily activity reports from Beckrow and her friend. [*Id*.]. The ALJ also noted a September 2016 pain specialist report in which Beckrow stated that the combination of fentanyl and Lyrica helped her back pain and functioning with no side effects. [*Id*.; ECF No. 9-16, PageID.905].

More generally, the ALJ found Beckrow's allegations of disabling limitations inconsistent with the record, including the results of a March 2016 MRI, a May 2016 CT of her lumbar spine, a July 2016 MRI of her cervical spine and EMG, and normal musculoskeletal examination results. [ECF No. 9-2, PageID.56-57]. And he concluded his RFC analysis by stating that "the objectively determined medical conditions" were not "of such severity that they could reasonably be expected to give rise to disabling pain or other limitations." [*Id*., PageID.66].

14

**D.**

The Court agrees with Beckrow that the ALJ here made some of the very errors highlighted in *Rogers*.

To start with, the ALJ gave greater weight to the opinion of the state agency consultant and non-examiner, Valerie Andrews, M.D., than he gave to Dr. Sarkar's opinion.  [ECF No. 9-2, PageID.62; ECF No. 9-3, PageID.125-126].  Although the ALJ found Dr. Andrew's opinion insufficiently restrictive, he agreed with Dr. Andrew's assessment that Beckrow could perform a limited range of light work.  [*Id*.].  The ALJ reasoned that Dr. Andrew's opinion resulted from "careful consideration of the objective medical evidence."  [ECF No. 9-2, PageID.62].  This reasoning showed disregard for the *Rogers* court's instruction that the opinions of treating physicians are "of special significance given the unique nature of fibromyalgia," and its disapproval of an ALJ giving greater weight to the opinions of non-examining physicians based on the lack of objective findings.  *Rogers*, 486 F.3d at 245.

The ALJ's emphasis on the lack of objective findings violates the holdings of *Rogers* and other precedent going back more than 30 years.  *Rogers*, 486 F.3d at 243; *Preston v. Sec'y of Health & Human Servs*., 854 F.2d 815, 820 (6th Cir.1988); *Swain v. Comm'r of Soc. Sec*., 297 F. Supp.

15

2d 986, 990 (N.D. Ohio 2003); *Kalmbach v. Comm'r of Soc. Sec.*, 409 F. App'x 852, 864 (6th Cir. 2011).  Over and over, courts have emphasized that "the absence of objective medical evidence to substantiate the diagnosis of fibromyalgia or its severity is basically irrelevant, and more 'aggressive' treatment is not recommended for fibromyalgia patients." *Kalmbach*, 409 F. App'x at 864.  The Commissioner is right that the objective medical evidence is relevant to some of Beckrow's other impairments, but the ALJ relied on that objective evidence to give little weight to Dr. Sarkar's physical assessment, and Dr. Sarkar's opinion about Beckrow's limitations was based in part on her diagnosis of fibromyalgia. [ECF No. 9-17, PageID.1006].

This case also mirrors *Rogers* in that the ALJ overstated the rigor of Beckrow's reported activities of daily living and failed to connect that reported activities to the assessed RFC.  In *Rogers*, the ALJ's description of the claimant's "somewhat minimal daily functions" included being "able to drive, clean her apartment, care for two dogs, do laundry, read, do stretching exercises, and watch the news."  *Rogers*, 486 F.3d at 248.  The court noted that those were not "comparable to typical work activities."  *Id.*; *see also Kalmbach*, 409 F. App'x at 864 (finding that claimant's testimony that she could go to the grocery store and church, prepare meals, dress

16

herself, and drive were "hardly consistent with eight hours' worth of typical work activities").

Here, the ALJ said that Beckrow's had described daily activities that were "not limited to the extent one would expect [ ] given the complaints of disabling symptoms and limitations."  [ECF No. 9-2, PageID.61].  He wrote, "She commented that in a typical day, she ate, watched television, napped, fiddled around the house, talked to family on the phone, and went to bed." [*Id*.].  The ALJ said that, at another time, Beckrow "commented that in a typical day, she has coffee, sits, performs her personal care, starts laundry, stands, picks up, naps, goes outside to the flower beds, does yard work, and feeds the cat, dog, and fish."  [*Id*.].

The ALJ's descriptions of Beckrow's "typical day" does not include daily functions that are "comparable to typical work activities."  *Rogers*, 486 F.3d at 248.  Most especially, activities like eating, drinking coffee, watching television, napping, fiddling around the house, talking on the phone, and going to bed provide no support for the ALJ's conclusion that she can perform the six to eight hours of standing or walking expected of someone doing light work.  SSR 83-10, 1983 WL 31251 (1983).

And the ALJ's decision omitted many statements about the limits of Beckrow's daily activities.  Beckrow's friend, Linda Scharff, described

visiting Beckrow two to four times a week for coffee or to go to the store. [ECF No. 9-6, PageID.334].  But Scharff also said that, because of Beckrow's severe pain, numbness, depression, and medication, she spent "a lot of days in bed.  When I call or stop in, she will still be in bed or I'll have [to] wake her up."  [*Id*., PageID.335-36].  The pain patch made her drowsy.  [*Id*., PageID.341].  According to Scharff, Beckrow prepared sandwiches or frozen meals instead of cooking because she needed to stand less.  [*Id*., PageID.336].  It took Beckrow "lots longer" to do laundry, sweep, clean, or mow, and she sometimes could not complete those tasks until the next day.  [*Id*.].  Scharff said that Beckrow could not enjoy most of her favorite hobbies, and that she had to switch positions from the chair to the bed when she watched television and read.  [*Id*., PageID.338]. Beckrow "seldom" went anywhere and "end[ed] up in bed for a day or two" when she engaged in activities.  [*Id*.].  Scharff believed that Beckrow could lift only light items, sit or stand for short periods, and walk "maybe about 1/4 mile on a good day."  [*Id*., PageID.339].

In her function report, Beckrow similarly reported that she was tired and weak, and could perform activities for two hours if she was "lucky." [ECF No. 9-6, PageID.322].  Beckrow said that she slept for a day or two after a flareup; "sometimes I just relax and can't do anything."  [*Id*.].  Her

meal preparation was limited to preparing sandwiches, cereal, and microwaveable food.  [*Id*., PageID.323].  Beckrow did house and yard work "on a very good day," but for two hours "at most."  [*Id*.].  Although Beckrow said she could drive, doing so caused flareups in her arms and fingers. [*Id*., PageID.324].  She would spend no more than an hour shopping in stores for food and animal supplies.  [*Id*.].  Beckrow described being limited in almost all functional activities because of pain and fatigue, and having flareups that required her to lay down for days after activities.  [*Id*., PageID.326].  She said she could walk for only a 1/2 hour before needing to rest.  [*Id*.].  Beckrow wrote that many of her medications caused her drowsiness, dizziness, and other side effects.  [*Id*., PageID.328].

Beckrow's hearing testimony matched her function report.  [ECF No. 9-2, PageID.85-95].  She said that she usually walked to get her mail or take her dog across the road to a trail, but that she sometimes drove or road on her lawnmower for those activities.  [*Id*., PageID.91].

The evidence of Beckrow's daily activities comports with Dr. Sarkar's September 2016 physical assessment that she could walk only one city block without significant pain, that she could sit, stand, and walk for no more than two hours in a workday, and that she would need unscheduled breaks and to lie down.  [ECF No. 9-17, PageID.1006].  The ALJ's claim

19

that Dr. Sarkar's physical assessment is more restrictive than Beckrow's reported daily activities is not supported by substantial evidence.

In sum, "the ALJ's description not only mischaracterizes [Beckrow's] testimony regarding the scope of her daily activities, but also fails to examine the physical effects coextensive with their performance." *Rogers*. 486 F.3d at 248-49. The ALJ provides no "logical bridge" between his reliance on the evidence of Beckrow's daily activities and his conclusion that she could perform the standing and walking required for light work. *Gross v. Comm'r of Soc. Sec*., 247 F. Supp. 3d 824, 830 (E.D. Mich. 2017) ("In the instant case, it is unclear on what the ALJ based her ultimate RFC conclusion, and she draws no accurate and logical bridge to instruct the Court of her reasoning."). The ALJ's decision should be reversed and remanded for further consideration.

## III.    CONCLUSION

For the reasons stated above, the Court **RECOMMENDS** that Beckrow's motion [ECF No. 14] be **GRANTED**; that the Commissioner's motion [ECF No. 15] be **DENIED**; and that this matter be **REMANDED** for further consideration under sentence four of 42 U.S.C. § 405(g).

s/Elizabeth A. Stafford
ELIZABETH A. STAFFORD
United States Magistrate Judge

Dated: February 18, 2021

## NOTICE TO THE PARTIES ABOUT OBJECTIONS

Within 14 days of being served with this report and recommendation, any party may serve and file specific written objections to this Court's findings and recommendations.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2).  If a party fails to timely file specific objections, any further appeal is waived.  *Howard v. Secretary of HHS*, 932 F.2d 505 (6th Cir. 1991)*.*  And only the specific objections to this report and recommendation are preserved for appeal; all other objections are waived.  *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir. 1991).

Each **objection must be labeled** as "Objection #1," "Objection #2," etc., and **must specify** precisely the provision of this report and recommendation to which it pertains.  Within 14 days after service of objections, **any non-objecting party must file a response** to the objections, specifically addressing each issue raised in the objections in the same order and labeled as "Response to Objection #1," "Response to Objection #2," etc.  The response must be **concise and proportionate in length and complexity to the objections**, but there is otherwise no page limitation.  If the Court determines that any objections are without merit, it may rule without awaiting the response.

## **<u>CERTIFICATE OF SERVICE</u>**

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on February 18, 2021.

<u>s/Marlena Williams</u>
MARLENA WILLIAMS
Case Manager